**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

SONDRA WYNN,                          :

      Plaintiff,                    :

vs.                                   :   CA 09-0790-CG-C

DAVISON DESIGN &                      :
DEVELOPMENT, INC.,
                                      :
      Defendant.

## REPORT AND RECOMMENDATION

This cause is before the undersigned for issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B), on the complaint (Doc. 1) and answer (Doc. 28), the defendant's motion for partial judgment on the pleadings (Doc. 29), plaintiff's memorandum in opposition (Doc. 38), and the defendant's reply brief (Doc. 41). After consideration of the foregoing pleadings, it is the undersigned's recommendation that the defendant's motion for partial judgment on the pleadings be **GRANTED IN PART AND DENIED IN PART**.

## FINDINGS OF FACT

1.     Sondra Wynn filed a three-count complaint against Davison Design & Development, Inc. in the United States District Court for the Northern District of Florida on October 8, 2009. (Doc. 1) The complaint arose out of an agreement entered into by the parties in 2003 to promote plaintiff's invention of a flower bouquet wrap. (*See id.*) The claims set forth in plaintiff's complaint allege breach of contract (Count I), violation of 35 U.S.C. § 297 (Count II), and unjust enrichment (Count III). (*Id.*)

4.     At all material times, Ms. Wynn has been in the business of wedding planning.

5.     It is common for the bride and her wedding party to carry a bouquet of flowers during the wedding ceremony and also during photographs taken in connection with a wedding. However, it is often difficult to use bouquets of actual, long-stemmed flowers for these purposes because some types of flowers preferred by brides do not maintain their freshness for extended periods of time outside of water.

6.     In the late 1990's or early 2000's, Smithers-Oasis Company [] began marketing a patented bouquet holder. A copy of U.S. Patent No. 5,927,002 [] describing this product is attached as Exhibit A. The '002 Patent claims a product that creates the illusion that a person is holding a bouquet of long-stemmed flowers. In fact, however, the stems have been cut and each end placed into a wettable foam mass, thus extending the life and freshness of the flowers.

7.     Ms. Wynn was familiar with and used the Smithers bouquet holder in planning weddings.

8.     In or around 2001, Ms. Wynn [] conceived an idea for a bouquet wrap for use with the Smithers bouquet holder. The wrap designed by Ms. Wynn circumscribed the bouquet holder and was fastened with Velcro. Ms. Wynn designed the wrap to be comprised of various fabrics and bows in order to provide a more finished and decorative "look" to the Smithers bouquet holder, which was made of a simple piece of white plastic.

9.     Ms. Wynn developed several prototypes of the bouquet wrap and contacted Davison about the possibility of promoting her invention by assisting in patenting, marketing or licensing the product that she had conceived.

10.     In or around April 2003, Ms. Wynn and Davison entered a contract for invention promotion services. Pursuant to the contract, Ms. Wynn retained Davison, inter alia, to file in her name disclosure documents with the United States Patent and Trademark Office [], perform a research patent search for product design purposes only, perform a project related data search, and compile all data into a professional business format. As part of the contract, Davison specifically agreed to maintain the confidentiality of Ms. Wynn's conception and to refrain from nonconfidential disclosures. Attached as Exhibit B is an excerpt from Davison's project summary acknowledging the contractual relationship and Ms. Wynn's conception of the bouquet wrap product.

11.     Notwithstanding that Ms. Wynn hired Davison to promote her bouquet wrap invention, beginning in early 2004 Davison began directing Ms. Wynn's efforts toward the design of a modified version of the Smithers bouquet holder. Ms. Wynn provided Davison several ideas for such a modified design, including implementation of a cone shape (as opposed to a cylindrical shape) for easier carrying, and implementation of a "lip" at the top of the device to prevent water from the foam from spilling over to the outside of the holder.

12.     Davison continued to focus its efforts on the modified bouquet holder throughout 2004 and 2005. Ultimately, in approximately August 2005, Davison presented Ms. Wynn with various prototypes and marketing materials relating to the modified bouquet holder, which Davison dubbed the "Easy Grip." During this time, Davison developed little, if any, work or effort toward development of Ms. Wynn's primary conception, which was the unique bouquet wrap.

13.     In December 2007 (sic),[1] Ms. Wynn visited a wholesale store in order to purchase various supplies for a wedding she was planning that weekend. While in the store, Ms. Wynn saw on the shelf, and purchased for $8.00, a direct copy of the bouquet wrap she had presented to Davison in 2003. The bouquet wrap purchased by Ms. Wynn was and continues to be sold by Smithers, doing business as "Oasis Floral."

14.     On information and belief, Davison disclosed Ms. Wynn's bouquet wrap idea to Smithers, in violation of the confidentiality provisions of its contract with Ms. Wynn. In this regard, a design research package provided to Ms. Wynn by Davison includes a copy of the '002 Patent. Thus, Davison knew and was aware of Smithers' involvement in the floral bouquet market and its potential interest in Ms. Wynn's bouquet wrap.

15.     On information and belief, Smithers has sold Ms. Wynn's bouquet wraps, at a price of approximately $8.00 per wrap, on a nationwide basis since at least 2007. Ms. Wynn believes that revenues from her bouquet wrap during this time may be in the hundreds of thousands, if not millions of dollars.

.     .     .

## **Count I: Breach of Contract**

.     .     .

_____

[1]     The correct date is December of 2006. (*See* Doc. 15, at 2)

18. Davison breached its contract with Ms. Wynn by failing to provide any or all of the services it promised to provide under the contract. Specifically, Davison essentially ignored the bouquet wrap idea and instead focused its efforts on a modified version of the Smithers bouquet holder.

19. Davison also breached the confidentiality provisions of its contract with Ms. Wynn by disclosing to Smithers, or others in contact with Smithers, Ms. Wynn's conception for the bouquet wrap, without Ms. Wynn's knowledge or consent.

20. Any conditions precedent to the maintenance of the claims alleged herein have been met, waived, discharged, performed, excused, or have occurred.

21. Ms. Wynn suffered damages caused by defendant's breach of the contract including, but not limited to: (a) lost time in patenting, marketing, selling or licensing the bouquet wrap, thereby preventing Ms. Wynn from realizing the revenues that ultimately accrued to Smithers; and/or (b) depriving Ms. Wynn of royalties, license fees or other compensation justly belonging to her by licensing or otherwise disclosing to Smithers, in violation of the contractual confidentiality provisions and for its own benefit and profit, Ms. Wynn's bouquet wrap product.

## Count II: Violation of 35 U.S.C. § 297

.     .     .

23. At all material times, Davison is and has been an invention promoter within the meaning of 35 U.S.C. § 297(c)(3).

24. Ms. Wynn was a customer of Davison under the meaning of 35 U.S.C. § 297(c)(2).

25. Ms. Wynn and Davison entered into a contract

whereby Davison was to provide invention promotion services within the meaning of 35 U.S.C. § 297(c)(4).

26.     Prior to entering into the contract for invention promotion services, Davison did not disclose to Ms. Wynn in writing the total number of inventions evaluated by defendant for commercial potential in the previous five years, nor did it disclose the number of those inventions that received positive evaluations, or the number of those inventions that received negative evaluations.

27.     Prior to entering into the contract for invention promotion services, Davison did not disclose to Ms. Wynn in writing the total number of customers who had contracted with defendant during the previous five years.

28.     Prior to entering into the contract for invention promotion services, Davison did not disclose to Ms. Wynn in writing the total number of customers known by defendant to have received a net financial profit as a direct result of the invention promotion services provided by defendant.

29.     Prior to entering into the contract for invention promotion services, Davison did not disclose to Ms. Wynn in writing the total number of customers known by defendant to have received license agreements for their inventions as a direct result of the invention promotion services provided by defendant.

30.     Prior to entering into the contract for invention promotion services, Davison did not disclose to Ms. Wynn in writing the names and addresses for all previous invention promotion companies with which defendant or its officers had collectively or individually been affiliated during the previous ten years.

31.     Plaintiff is informed and believes and on that basis alleges that, to the extent and if any disclosure was made with

respect to the matters mentioned in paragraphs 26, 27, 28, 29 and 30, such information was inaccurate, false and misleading.

32.     Plaintiff is informed and believes and on that basis alleges that, to the extent and if any disclosure was made with respect to the matters mentioned in paragraphs 26, 27, 28, 29 and 30, such information was orally dismissed and mentioned as irrelevant.

33.     As a direct result of the failures to disclose and/or provision of inaccurate, false, and misleading information, as mentioned in paragraphs 26, 27, 28, 29, 30, 31 and 32, plaintiff was induced to pay at least $8,000.00 to defendant.

34.     As a direct result of the failures to disclose and/or provision of inaccurate, false and misleading information, as mentioned in paragraphs 26, 27, 28, 29, 30, 31 and 32, plaintiff has been damaged by the loss of time in patenting[,] marketing and selling plaintiff's bouquet wrap product.

35.     Plaintiff is informed and believes and on that basis alleges that Davison took the actions herein discussed intentionally, willfully and with the purpose of deceiving plaintiff.

## Count III: Unjust Enrichment

.     .     .

37.     On information and belief, Davison (or its predecessors) had access to and knowledge of Ms. Wynn's conceptions and ideas and communicated those ideas to Smithers or persons in contact with Smithers, likely in exchange [f]or a license fee or some other compensation.

38.     As a direct and proximate result of the use and misappropriation of Ms. Wynn's ideas for the bouquet wrap product, without identifying Ms. Wynn as the true inventor,

Davison has been unjustly enriched.

(*Id.* at ¶¶ 4-15, 18-21, 23-35 & 37-38 (footnote added))

2.      On November 2, 2009, Davison filed a motion to dismiss the complaint for lack of personal jurisdiction (Doc. 7). By order dated December 1, 2009, United States District Judge M. Casey Rodgers found personal jurisdiction lacking in Florida but in lieu of dismissing the case, she transferred the case to this Court. (Doc. 15)

3.      Davison answered the complaint in this Court on December 29, 2009 (Doc. 28) and that same day filed its motion for partial judgment on the pleadings (Doc. 29). Therein, defendant seeks dismissal of Count II, alleging a violation of 35 U.S.C. § 297, on the basis that it is barred by the four-year uniform federal statute of limitations. (*Id.* at 1) In addition, Davison seeks the dismissal of Count III, alleging unjust enrichment, arguing that same is barred under Alabama law since both parties "agree in their pleadings that an express contract on the subject governs the party's (sic) relations." (*Id.*)

## CONCLUSIONS OF LAW

### A.    Motion for Judgment on the Pleadings.

1.    Rule 12(c) of the Federal Rules of Civil Procedure provides that "[a]fter the pleadings are closed–but early enough not to delay trial–a party may move for judgment on the pleadings."[2] A motion for judgment on the pleadings is governed by the same standard as a Rule 12(b)(6) motion to dismiss for failure to state a claim upon which relief may be granted. *International Fidelity Ins. Co. v. BMC Contractors, Inc.,* 2009 WL 2143803, *2 (M.D. Ga. 2009) (citation omitted); *see also Horsley v. Feldt,* 304 F.3d 1125, 1131 (11th Cir. 2002) ("'Judgment on the pleadings is appropriate only when the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'"); *Mergens v. Dreyfoos,* 166 F.3d 1114, 1117 (11th Cir.) ("Judgment on the pleadings is appropriate where no issue of material fact remains unresolved and the moving party is entitled to judgment as a matter of law."), *cert. denied*, 528 U.S. 820, 120 S.Ct. 63, 145 L.Ed.2d 55 (1999).

The Court may grant the motion only if it appears beyond doubt

---

[2]    "Federal district courts have applied a 'fairly restrictive standard in ruling on motions for judgment on the pleadings.'" *Dawley v. NF Energy Saving Corp. of America*, 2008 WL 4534263, *1 (M.D. Fla. 2008), quoting 5A C. WRIGHT & A. MILLER, FEDERAL PRACTICE and PROCEDURE § 1368, at 222 (2004).

> that the nonmovant can prove no set of facts in support of his
> claim, which would entitle him to relief, or if material facts are
> undisputed and judgment on the merits is possible by merely
> considering the contents of the pleadings. In ruling on a motion
> for judgment on the pleadings, the Court must view the
> complaint in the light most favorable to the plaintiff. In general,
> the plaintiff need not set forth all the facts upon which the claim
> is based; rather, a short and plain statement of the claim is
> sufficient if it gives the defendant fair notice of what the claim
> is and the grounds upon which it rests.

*International Fidelity Ins. Co., supra*, at *2 (internal citations omitted). While

Rule 8(a)(2) of the Federal Rules of Civil Procedure requires only "a short and

plain statement of the claim showing that the pleader is entitled to relief[,]" the

Supreme Court recently made clear in *Bell Atlantic Corp. v. Twombly*, 550

U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) and *Ashcroft v. Iqbal*, __

U.S. ____, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) that the rule's

pleading standard "demands more than an unadorned, the defendant-

unlawfully-harmed-me accusation." __ U.S. at __, 129 S.Ct. at 1949. Indeed,

"[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of

the elements of a cause of action will not do.'" *Id*., quoting *Bell Atlantic Corp.*

*v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 1964-1965, 167 L.Ed.2d 929

(2007). "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid

of 'further factual enhancement.'" *Id*., quoting *Twombly,* 550 U.S. at 557, 127

S.Ct. at 1955.

Two working principles underlie our decision in *Twombly*. First, the tenet that a court must accept as true all of the allegations contained in a complaint is applicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions. Second, only a complaint that states a plausible claim for relief survives a motion to dismiss or a motion for judgment on the pleadings]. Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged–but it has not show[n]–that the pleader is entitled to relief.

*Id*. at ____, 129 S.Ct. at 1949-1950 (internal citations and quotation marks omitted); *see also id*. at __, 129 S.Ct. at 1950-1951 (a plaintiff must nudge his claims "'across the line from conceivable to plausible.'").

**B.** **The Inventors' Rights Act of 1999/American Inventors' Protection Act, 35 U.S.C. § 297**.

2.      "Congress enacted the Inventors' Rights Act of 1999, 35 U.S.C. § 297, to protect inventors from invention promotion scams and the deceptive advertising related to them by authorizing the PTO[3] to publicize complaints that it receives against invention promoters." *Invention Submission Corp. v.*

---

[3]      PTO is an acronym for the United States Patent and Trademark Office. *See Invention Submission Corp., infra*.

*Rogan*, 357 F.3d 452, 454 (4th Cir.) (footnote added), *cert. denied sub nom.*

*Invention Submission Corp. v. Dudas,* 543 U.S. 955, 125 S.Ct. 415, 160

L.Ed.2d 317 (2004).[4] The Act reads, in relevant part, as follows:

> **(a) In general.**– An invention promoter shall have a duty to disclose the following information to a customer in writing, prior to entering into a contract for invention promotion services:
>
> > **(1)** the total number of inventions evaluated by the invention promoter for commercial potential in the past 5 years, as well as the number of those inventions that received positive evaluations, and the number of those inventions that received negative evaluations;
> >
> > **(2)** the total number of customers who have contracted with the invention promoter in the past 5 years, not including customers who have purchased trade show services, research, advertising, or other nonmarketing services from the invention promoter, or who have defaulted in their payment to the invention promoter;
> >
> > **(3)** the total number of customers known by the invention promoter to have received a net financial profit as a direct result of the invention promotion services provided by such invention promoter;
> >
> > **(4)** the total number of customers known by the invention promoter to have received license agreements for their inventions as a direct

---

[4] This Act has also been referred to as the American Inventor's Protection Act ("AIPA"). *See Federal Trade Comm'n v. Davison Associates, Inc., infra.*

result of the invention promotion services provided by such invention promoter; and

**(5)** the names and addresses of all previous invention promotion companies with which the invention promoter or its officers have collectively or individually been affiliated in the previous 10 years.

**(b) Civil action.**–**(1)** Any customer who enters into a contract with an invention promoter and who is found by a court to have been injured by any material false or fraudulent statement or representation, or any omission of material fact, by that invention promoter (or any agent, employee, director, officer, partner, or independent contractor of such invention promoter), or by the failure of that invention promoter to disclose such information as required under subsection (a), may recover in a civil action against the invention promoter (or the officers, directors, or partners of such invention promoter), in addition to reasonable costs and attorneys' fees–

**(A)** the amount of actual damages incurred by the customer; or

**(B)** at the election of the customer at any time before final judgment is rendered, statutory damages in a sum of not more than $5,000, as the court considers just.

**(2)** Notwithstanding paragraph (1), in a case where the customer sustains the burden of proof, and the court finds, that the invention promoter intentionally misrepresented or omitted a material fact to such customer, or willfully failed to disclose such information as required under subsection (a), with the purpose of deceiving that customer, the court may increase damages to not more than three times the amount awarded, taking into account past complaints made against the invention promoter that resulted in regulatory sanctions or other corrective

> actions based on those records compiled by the Commissioner
> of Patents under subsection (d).

35 U.S.C. § 297(a) & (b); *see Federal Trade Comm'n v. Davison Associates, Inc.,* 431 F.Supp.2d 548, 553 (W.D. Pa. 2006) ("The American Inventor's Protection Act, 35 U.S.C.A. § 297 ('AIPA'), requires invention-promotion firms to make the following disclosures before selling their services: (1) total number of inventions evaluated for commercial potential in the past 5 years, as well as the number of these inventions that received positive evaluations, and the number that received negative evaluations; (2) the total number of customers who have contracted with the invention promoter in the past 5 years, not including customers who have purchased, among other things, research or other non-marketing services; (3) the total number of customers known by the invention promoter to have received net financial profit as a direct result of the invention promotion services; (4) the total number of customers to have received licensing agreements as a direct result of the invention promotion services; and (5) the names and addresses of all previous invention promotion companies with which the invention promoter or its officers have been affiliated in the previous 10 years.").

3. Davison contends that Count II of plaintiff's complaint, alleging a violation of 35 U.S.C. § 297, is barred by the four-year uniform federal

statute of limitations. (Doc. 29, at 1) The parties in this case are in agreement that the four-year statute of limitations set forth in 28 U.S.C. § 1658(a) is applicable to this case. (*Compare id.*, at 2 ("35 U.S.C. § 297(b) does not contain its own statute of limitations. It thus falls within the 'catch-all' uniform federal statute of limitations of 28 U.S.C. § 1658(a)[.]") *with* Doc. 38, at 4 ("Davison argues that the four-year 'catch-all' statute of limitations governs Ms. Wynn's claim for violation of the AIPA. . . . Ms. Wynn agrees.")) "Except as otherwise provided by law, a civil action arising under an Act of Congress enacted after the date of the enactment of this section may not be commenced later than 4 years after the cause of action accrues." 28 U.S.C. § 1658(a). Since the AIPA was enacted on November 29, 1999, *see* 35 U.S.C. § 297 ( historical & statutory notes), almost nine years after the December 1, 1990 enactment date of 28 U.S.C. § 1658(a), *see id.* (practice commentary), the four-year statute of limitations set forth in § 1658(a) is applicable to this case.

4.      The key issue in this case becomes determining when Ms. Wynn's cause of action under the AIPA accrued. As the defendant correctly points out (*see* Doc. 41, at 1),  the general rule is that a statute of limitations period commences when a plaintiff has "'a complete and present cause of action[,]'" that is, when " the plaintiff can file suit and obtain relief." *Bay Area*

*Laundry & Dry Cleaning Pension Trust Fund v. Ferbar Corp. of California*, 522 U.S. 192, 201, 118 S.Ct. 542, 549, 139 L.Ed.2d 553 (1997) (citations omitted). According to Davison, plaintiff's four-year statute of limitations began to run in 2003 when it (allegedly) failed to make the required disclosures under the AIPA prior to entering into the invention promotion contract with plaintiff thereby barring her present October 8, 2009 cause of action. (Doc. 29, at 1-3; Doc. 41, at 1-3) In an attempt to persuade this Court to find Count II of plaintiff's complaint time-barred, the defendant likens the disclosures required by the AIPA to disclosures required under the Truth in Lending Act ("TILA") and cites to a TILA case out of this district, *Williams v. Saxon Motgage Services, Inc.,* 2007 WL 2828752, for the proposition that "the statute of limitations on TILA claims runs from the date of the loan transaction and claims are time-barred on their face after a year unless saved by equitable tolling." (Doc. 41, at 2) The defendant, again relying on *Williams*, contends that since Wynn "does not allege fraud or any other action by defendant to conceal evidence of the alleged non-disclosure[,]" equitable tolling is inapplicable and cannot save the running of the four-year statute of limitations since the invention promotion contract was executed in 2003 and this action was not filed until October of 2009. (*See id*. at 2-3)

5.     While defendant's statute-of-limitations argument has facial appeal, it is one which the Court should decline to grant at the pleadings stage since there are no reported cases which have addressed the issues of when a plaintiff has a complete and present cause of action under the AIPA[5] and applicability of the doctrine of equitable tolling to AIPA cases. Because no cases have addressed these issues in relation to AIPA cases, the undersigned recommends that this Court, at this stage of the proceedings, decline to find it

---

[5]     The language of § 297(b) providing that "[a]ny customer who enters into a contract with an invention promoter and who is found by a court to have been injured by any material false or fraudulent statement or representation . . . or by the failure of that invention promoter to disclose such information as required under subsection (a), may recover in a civil action" convinces the undersigned, at this stage of the proceedings, that a court could legitimately run the four-year limitations from the point at which a plaintiff discovers (or should have discovered) she has been injured by the failure to disclose (or the making of false disclosures) as opposed to the date upon which the promotion contract was executed. *Cf. Barry Aviation Inc. v. Land O'Lakes Municipal Airport Comm'n,* 377 F.3d 682, 688 (7th Cir. 2004) ("For both RICO claims and § 1983 claims, a cause of action accrues when the plaintiff knew or should have known that it had sustained an injury. This rule is referred to as the discovery rule because the accrual date is not determined when the injury occurs but when it is discovered or should have been discovered."); *Cada v. Baxter Healthcare Corp.,* 920 F.2d 446, 450 (7th Cir. 1990) ("The rule that postpones the beginning of the limitations period from the date when the plaintiff is wronged to the date when he discovers he has been injured is the 'discovery rule' of federal common law, which is read into statutes of limitations in federal-question cases . . . in the absence of a contrary directive from Congress."), *cert. denied*, 501 U.S. 1261, 111 S.Ct. 2916, 115 L.Ed.2d 1079 (1991); *Brian Route 50 Auto Sales, Inc. v. City of Kankakee*, 2010 WL 375597, *4 (C.D. Ill. 2010) ("Section 1983 claims accrue when a plaintiff knows or should know that his or her constitutional rights have been violated. Accrual is the date on which the statute of limitations begins to run. 'It is not the date on which the wrong that injures the plaintiff occurs, but the date–often the same, but sometimes later–on which the plaintiff discovers that he has been injured.' The rule that postpones the beginning of the limitations period from the date when plaintiff is wronged to the date when he discovers he has been injured is the 'discovery rule' of federal common law[.]").

apparent from the face of the pleadings either that plaintiff's AIPA claim is time-barred or that plaintiff can prove no set of facts that toll the statute. *Cf. Tello v. Dean Witter Reynolds, Inc.,* 410 F.3d 1275, 1288 & 1288 n.13 (11th Cir. 2005) ("Dismissal under Federal Rule of Civil Procedure 12(b)(6) 'on statute of limitations grounds is appropriate only if it is "apparent from the face of the complaint" that the claim is time-barred.' At the motion-to-dismiss stage, a complaint may be dismissed on the basis of a statute-of-limitations defense 'only if it appears beyond a doubt that Plaintiffs can prove no set of facts that toll the statute.'").

6.      Based on the foregoing, the undersigned recommends that the Court deny defendant's motion for judgment on the pleadings as it relates to Count II of plaintiff's complaint.

**C.      Alabama State-Law Claim for Unjust Enrichment.**

7.      Defendant has moved to dismiss plaintiff's unjust enrichment claim on the basis that it "relates to the same subject matter–alleged breach of confidentiality regarding plaintiff's ideas for an invention–which is governed by an express contract that plaintiff has alleged and ***defendant has admitted***." (Doc. 29, at 3 (emphasis supplied)) In so moving, defendant cites to Alabama case law and law from this district, and another federal district court in

Alabama, recognizing "'that where an express contract exists between two parties, the law generally will not recognize an implied contract regarding the same subject matter.'" *White v. Microsoft Corp.*, 454 F.Supp.2d 1118, 1133 (S.D. Ala. 2006 (citations omitted)); *see also id.* ("[W]here a plaintiff has brought claims sounding in both express contract and quasi-contract as to the same subject matter, Alabama courts have deemed the quasi-contract claim not to be cognizable."); *Pearson's Pharmacy, Inc. v. Express Scripts, Inc.,* 505 F.Supp.2d 1272, 1278 (M.D. Ala. 2007) ("The court finds that plaintiffs have an adequate remedy at law for damages under a theory of breach of contract. Therefore, the plaintiffs' unjust enrichment and constructive trust count is due to be DISMISSED with prejudice."); *Kennedy v. Polar-BEK & Baker Wildwood Partnership*, 682 So.2d 443, 447 (Ala. 1996) ("[U]nder Alabama law, claims of both an express and an implied contract on the same subject matter are generally incompatible. This Court has recognized that where an express contract exists between two parties, the law generally will not recognize an implied contract regarding the same subject matter."); *see Brannan & Guy, P.C. v. City of Montgomery,* 828 So.2d 914, 921 (Ala. 2002) ("When an express contract exists, an argument based on a quantum meruit recovery in regard to an implied contract fails."); *Betts v. McDonald's Corp.*,

567 So.2d 1252, 1255 (Ala. 1990) ("Betts quantum meruit argument fails. 'It has long been recognized in Alabama that the existence of an express contract [here, the broker's statement] generally excludes an implied agreement relative to the same subject matter.'").

8.      In opposing Davison's motion to dismiss her unjust enrichment claim, plaintiff admits that the defendant "is likely correct" that she cannot "recover the same damages for both her breach of contract and unjust enrichment claims[,]" but contends that the issue is one of election remedies and that she need not make such election at the pleadings stage. (Doc. 38, at 9) While plaintiff cites to *Wynfield Inns v. Edward LeRoux Group., Inc.,* 896 F.2d 483, 488 (11th Cir. 1990) for the general proposition that "an election between inconsistent remedies is made after a verdict is entered but prior to the entry of judgment[,]"[6] she relies on cases outside Alabama and the federal districts in Alabama in arguing that courts have denied motions to dismiss unjust enrichment/quasi-contractual claims based on the argument Davison presses (*see* Doc. 38, at 9-10, citing *Siegel-Robert, Inc. v. Mayco Int'l, LLC,* 2007 WL 3173365 (E.D. Mich. 2007); *Lewis v. First American Title Ins. Co.,*

---

[6]      The undersigned finds plaintiff's citation to *Wynfield Inns* of limited value because the Eleventh Circuit derived this general proposition from Florida law. *Id.* at 488, citing *Barbe v. Villeneuve,* 505 So.2d 1331, 1333 (Fla. 1987).

2007 WL 2815041 (D. Idaho 2007); and *Ironton Metals Corp. v. Niagra LaSalle UK Ltd.,* 2006 WL 53955 (W.D. Pa. 2006)). Moreover, plaintiff seeks to distinguish the cases cited by defendant arguing that they "do not stand for the proposition that an alternative claim for unjust enrichment, asserted in connection with a claim for breach of express contract, should be dismissed at the pleading stage." (Doc. 38, at 10)[7]

9.      With this last stroke of the pen, plaintiff is clearly admitting that her unjust enrichment claim relates to the same subject matter as her breach of express contract claim. (Doc. 38, at 10) In other words, both claims relate to the alleged breach of confidentiality regarding plaintiff's ideas for an invention as set forth in the written confidentiality agreements. (*See id.*) Nevertheless, plaintiff contends that she does not have to elect her remedy at this stage of the proceedings.

10.      While plaintiff's election-of-remedies argument would have merit if Davison had made any noise that there exists no express contract in this case, *cf. ANZ Advanced Technologies, LLC v. Bush Hog, LLC,* 2009 WL 3415650, *9 & *10 (S.D. Ala. Oct. 20, 2009) ("Plaintiffs argue, however, that

---

[7]      Recognizing that the court in *Pearson's Pharmacy, Inc., supra*, did dismiss an unjust enrichment claim at the pleadings stage, plaintiff simply contends that this case is of limited precedential value because the court engaged in no real discussion of the issue. (*Id*. n.5)

they assert these claims in the alternative in the event Defendants prevail on their contention that the termination provisions agreed to by Bush Hog after Bush Hog exercised its alleged option under the 'Non-Cause Termination' provision of the 2007 UTV Supply Agreement ***did not constitute an express contract which would bar Plaintiffs' claims to equitable relief***. . . . Plaintiffs are entitled to an opportunity to prove that they performed services for Bush Hog pursuant to promises made by Bush Hog after it exercised its alleged option under the 'Non-Cause Termination' provision of the 2007 UTV Supply Agreement and the value of those services. . . . Plaintiffs are entitled to pursue their unjust enrichment claim at this juncture." (emphasis supplied)), given that the existence of an express contract is not disputed (*compare* Doc. 29, at 3 (defendant's admission that the confidentiality agreements entered by the parties constitute express contracts) *with* Doc. 28, ¶ 10 ("Defendant admits that in March 2003 and June 2003 it entered into written agreements with plaintiff which provided for confidentiality regarding plaintiff's ideas for an invention.") and Doc. 38, Plaintiff's Memorandum in Opposition to Defendant's Motion for Partial Judgment on the Pleadings, at 1 ("Ms. Wynn entered two contracts with Davison in 2003, while she was living in Ozark, Alabama.")), and plaintiff admits that her breach of contract and unjust

enrichment claims concern the same subject matter (Doc. 38, at 10), the two claims are incompatible and require dismissal of the unjust enrichment claim, *Northern Assurance Co. of America v. Bayside Marine Constr., Inc.,* 2009 WL 151023, *3 & *4 (S.D. Ala. Jan. 21, 2009) ("Dismissal of a claim under Rule 12(b)(6) for failure to state a claim is proper where it is clear that no relief can be granted under any set of facts that could be proved consistent with the allegations. . . . In Alabama, the doctrine of unjust enrichment is an equitable remedy which issues only where there is no adequate remedy at law. . . . BMC's unjust enrichment counterclaim (based on Plaintiff's receipt of the benefits of the insurance premiums and denial of coverage) clearly arises from the contracts at issue–the insurance policies–the same policies upon which the breach of contract counterclaim (Count Two) and bad faith denial of coverage (Count One) are based. Such unjust enrichment claims are precluded, as there is an adequate remedy at law for damages under those theories of recovery."); *cf. ANZ Advanced Technologies, LLC*, at *9 (court indicated that it would have dismissed plaintiffs' unjust enrichment and quantum meruit claims had the defendant not challenged the existence of an express contract, given the plaintiffs' acknowledgment "that their claims founded on an express contract would not support a claim for equitable relief such as their claim for unjust

enrichment or quantum meruit[,]" and their concession that "'[w]hen an express contract exists, an argument based on quantum meruit recovery in regard to an implied contract fails.'"). In other words, because an express contract exists regarding the same subject matter, plaintiff cannot claim unjust enrichment.

11.     In light of the foregoing, the undersigned recommends that the Court grant Davison's motion for judgment on the pleadings as it relates to plaintiff's claim for unjust enrichment (Count III). Plaintiff's unjust enrichment claim is due to be dismissed with prejudice.

## CONCLUSION

It is recommended that defendant's motion for partial judgment on the pleadings (Doc. 29) be **GRANTED IN PART** and **DENIED IN PART**. The Court should **DENY** the motion to the extent it is directed to Count II of plaintiff's complaint, that is, her AIPA claim; however, the motion should be **GRANTED** to the extent it is directed to Count III of the complaint. Plaintiff's unjust enrichment claim should be dismissed with prejudice.

**DONE** this the 19th day of February, 2010.

  s/WILLIAM E. CASSADY
**UNITED STATES MAGISTRATE JUDGE**

**MAGISTRATE JUDGE'S EXPLANATION OF PROCEDURAL RIGHTS AND
RESPONSIBILITIES FOLLOWING RECOMMENDATION, AND
FINDINGS CONCERNING NEED FOR TRANSCRIPT**

1.      ***Objection***.  Any party who objects to this recommendation or anything in it must, within fourteen (14) days of the date of service of this document, file specific written objections with the Clerk of this court.  Failure to do so will bar a *de novo* determination by the district judge of anything in the recommendation and will bar an attack, on appeal, of the factual findings of the Magistrate Judge.  *See* 28 U.S.C. § 636(b)(1)(C); *Lewis v. Smith*, 855 F.2d 736, 738 (11th Cir. 1988); *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. Unit B, 1982)(*en banc*).  The procedure for challenging the findings and recommendations of the Magistrate Judge is set out in more detail in SD ALA LR 72.4 (June 1, 1997), which provides that:

> A party may object to a recommendation entered by a magistrate judge in a dispositive matter, that is, a matter excepted by 28 U.S.C. § 636(b)(1)(A), by filing a 'Statement of Objection to Magistrate Judge's Recommendation' within ten days[8] after being served with a copy of the recommendation, unless a different time is established by order.  The statement of objection shall specify those portions of the recommendation to which objection is made and the basis for the objection.  The objecting party shall submit to the district judge, at the time of filing the objection, a brief setting forth the party's arguments that the magistrate judge's recommendation should be reviewed *de novo* and a different disposition made.  It is insufficient to submit only a copy of the original brief submitted to the magistrate judge, although a copy of the original brief may be submitted or referred to and incorporated into the brief in support of the objection.  Failure to submit a brief in support of the objection may be deemed an abandonment of the objection.

> A magistrate judge's recommendation cannot be appealed to a Court of Appeals; only the district judge's order or judgment can be appealed.

2.      ***Transcript (applicable Where Proceedings Tape Recorded)***.  Pursuant to 28 U.S.C. § 1915 and FED.R.CIV.P. 72(b), the Magistrate Judge finds that the tapes and original records in this case are adequate for purposes of review.  Any party planning to object to this recommendation, but unable to pay the fee for a transcript, is advised that a judicial determination that transcription is necessary is required before the United States will pay the cost of the transcript.

---

[8]      Effective December 1, 2009, the time for filing written objections was extended to "14 days after being served with a copy of the recommended disposition[.]" Fed.R.Civ.P. 72(b)(2).